In re CONDON.

Appeal of BROADWAY TRUST CO.

(Circuit Court of Appeals, Second Circuit.   December 9, 1913.)

No. 68.

**1. BANKRUPTCY (§ 90*)—INVOLUNTARY PROCEEDING—ANSWER—VOLUNTARY PE-TITION.**

Bankr. Act July 1, 1898, c. 541, § 1, subd. 20, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3419), provides that the word "petition," as used in the act, shall mean a paper filed in a bankruptcy court or with the clerk or deputy clerk, by a debtor, praying for the benefits of this act, or by creditors alleging the commission of an act of bankruptcy by the debtor therein named. *Held*, that where an involuntary petition was filed against an alleged bankrupt, and he answered that he could not truth-fully deny that he was insolvent, and prayed for the protection of all his creditors and that they might all be treated alike and that he be ad-judged a bankrupt, such answer did not constitute a voluntary petition so as to change the proceeding into a voluntary one and relieve the cred-itors from proving an act of bankruptcy.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 124;  Dec. Dig. § 90.*

For other definitions, see Words and Phrases, vol. 6, p. 5368;  vol. 8, p. 7753.]

**2. BANKRUPTCY (§ 81*)—INVOLUNTARY PETITION—REQUISITES—ACT OF BANK-RUPTCY—SPECIFICATION.**

An involuntary bankruptcy petition, alleging in the language of the statute that the alleged bankrupt had made transfers to hinder, delay, or defraud creditors, and also *transfers with the intent to prefer cred-itors,* without any specification of any of the facts claimed as a basis for any of such charges, was insufficient.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 59, 113–118, 125;  Dec. Dig. § 81.*]

**3. BANKRUPTCY (§ 84*)—INVOLUNTARY PETITION—INSUFFICIENCY—AMENDMENT—EFFECT—FOUR MONTHS' PERIOD.**

Where an involuntary bankruptcy petition was fatally defective prior to the amendment, the date of the amendment must be taken as the date from which the four months' period specified in Bankr. Act July 1, 1898, c. 541, § 3b, 30 Stat. 546 (U. S. Comp. St. 1901, p. 3422), is to be calculated.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 126–129;  Dec. Dig. § 84.*]

**4. BANKRUPTCY (§ 58*)—ACTS OF BANKRUPTCY—PREFERENTIAL TRANSFER.**

Where an alleged bankrupt, with knowledge of his hopelessly insolvent condition, made a payment to a creditor in settlement of an antecedent debt, such payment was a preference and an act of bankruptcy, though the insolvent did not have an actual, as distinguished from an imputed, intent to prefer such creditor.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 57, 72–79, 83;  Dec. Dig. § 58.*]

Appeal from the District Court of the United States for the South-ern District of New York;  Learned Hand, Judge.

This cause comes here upon appeal from an adjudication of bank-ruptcy against Martin J. Condon.   The appeal is not taken by Condon,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

who in his answer to the original petition stated that he could not "truthfully deny that he was insolvent," and that "his assets are far below the amount of his stated liabilities," and prayed that, "for the protection of all his creditors and that all may be treated alike," he be adjudged a bankrupt. The appellants are two creditors whose liens by way of judgment, etc., will be cut off,.if the adjudication be·sus-' tained. The opinion· of the District Court will be found in 198 Fed.' 947.

F. E. M. Bullowa and Emilie M. Bullowa, both of New York City, for appellant.

Tompkins McIlvaine, Ernest W. Kelsey, and Earl C. Demoss, all of New York City, and Allen W. Ashburn, Jr., of Los Angeles, Cal., for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

LACOMBE, Circuit Judge. [1] Two preliminary questions may be first disposed of. It is contended that the concessions and ·prayer in Condon's answer (see quotations supra) turned this involuntary proceeding into a voluntary one, in which no specific act of bankruptcy need be proved. The· argument in support of this proposition rests practically upon the language of section 1, subd. 20, which gives the following definition of the word "petition" as used in the act:.

> " 'Petition' shall mean a paper filed in a court of bankruptcy or with a clerk or deputy clerk by a debtor praying for the benefits of this. act, or by creditors alleging the commission of an act of bankruptcy by a debtor therein named."

It is argued that the answer being a "paper" which prays for the benefits of the act, such benefits including an· adjudication, is to be treated as a "voluntary petition." We find no merit in the contention.

[2] The original petition, filed April 12, 1911, merely alleged, in the language of the statute, that Condon had made transfers to hinder, delay, or defraud creditors, and also transfers with intent to prefer creditors. There was no specification of any of these, nor were any facts in relation thereto set forth. This was insufficient under decisions of this court. In re Rosenblatt, 193 Fed. 638, 113 C. C. A. 506 (Jan. 29, 1912); and In re Brocton Ideal Shoe Co., 202 Fed. 199, 120 C. C. A. 447 (Jan. 13th, 1913).

[3] Thereafter on May 25, 1911, the petition was amended·by 'set-ting forth the details of twelve separate transactions of the kind charged in the original petition. . Since the petition became a sufficient one only when it was fortified with this amendment, the date of the amendment must be taken as the date from which the four months' period of section 3b is to be calculated. This eliminates all of said alleged transactions except the last four. Since a single act of bankruptcy if proved will sustain an adjudication, it will be sufficient to consider only the twelfth of these alleged transfers.

[4] On April 5, 1911, Condon made a payment to B. Altman & Co. in settlement of an antecedent debt. It is charged that this was a preferential transfer. The special master and the district judge so held.

209 F.—51

Condon, a business man of excellent reputation and considerable means, in 1909 and 1910 joined with William J. Cummins and others in a number of enterprises requiring large capital and credit. The associates acquired, or became largely interested in, the Carnegie Trust Company, Van Norden Trust Company (Madison Trust Company), the Nineteenth Ward Bank, the Twelfth Ward Bank in this city, and the Platt Iron Works at Dayton, Ohio. Condon put no cash into these enterprises, but joined with the others in guaranteeing payments in very large amounts. Among such guaranties was one to Andrew Carnegie of a loan of $2,000,000 at par of 5 per cent. steel bonds, which were worth not less than par. This amount alone was about four times his total net assets, and there were other guaranties of large amount. The Carnegie Trust Company failed on January 7, 1911. On January 8th and 9th the Madison Trust Company, the Nineteenth Ward and the Twelfth Ward Banks had been subjected to heavy runs and were in failing condition. An arrangement of merger for liquidation of the Madison Trust Company with the Equitable Trust Company was made January 9, 1911, and all the associates' holdings in the banks were transferred to a trustee; Condon and the others jointly and severally agreeing to indemnify him against loss. The Platt Iron Works was also in failing circumstances.

The details of the testimony bearing on the financial situation are comprehensively set forth in the report of the special master, which contains an elaborate analysis of Condon's assets and liabilities. That long before the payment to Altman & Co. (April 5, 1911) he was insolvent is clearly demonstrated; indeed, we do not understand that it is seriously contended that he was then solvent. The payment to Altman & Co. was, therefore a preferential one. It is contended, however, that there was no intent to prefer. Of course, if Condon supposed at the time that he was insolvent, he will be presumed to intend the consequences which will result from selecting a particular creditor and paying him under such conditions. Quite probably he still hoped that, in some way or other, he would be relieved from his difficulties. But if every person, who may be hopelessly insolvent and yet is of an optimistic temperament, may pay selected creditors, persuading himself that some time or other he will be able to pay his other creditors, the provisions of the Bankruptcy Act as to "preferential payments" cannot be of much practical value.

Condon had not kept a list of all the obligations he had personally entered into to carry on the various enterprises on which he had embarked, but he did know that they were enormous, greatly in excess of the total amount of his individual resources. The Carnegie Trust Company had collapsed, quickly followed by the other associated enterprises. Judgments had been entered against himself and execution returned unsatisfied. He must have known, if he gave the matter any intelligent thought, that it would be a piece of rare good fortune, if some of the persons with whom he was jointly liable upon these guaranties, obligations in some cases past due, would pay them off and give him abundance of time to contribute his share or so much of it as he might be able to pay. There is one suggestive piece of evidence in the

record. On January 10, 1911, three days after the failure of the Carnegie Trust Company, and the day after the merger for liquidation of the other concerns coupled with the new agreement to indemnify the trustee against loss, he drew $35,000 out of his personal account with his brokers and deposited it to his own account in the Second National Bank. Two days thereafter he paid out of this sum to a mining company in which he was interested $20,000. He owed this mining company nothing; it was an advance to help the company along, and was made because he had got some friends interested in this mining enterprise and wished to help it along so as to save them from loss. It is a reasonable inference that he chose this time, when he was himself in straits, to help 'it along, because he appreciated that if he did not contribute the $20,000 then he might later on be in such a financial condition that he could not contribute anything to that cause.

We are satisfied that the payment to Altman & Co. was made with the intent that they, who had the month previous furnished personal necessaries and comforts for himself and his family, should be paid, whatever might be the result of the financial catastrophe in which he seemed to be involved. If so, it was as we think an act of bankruptcy under section 3a(2).

The adjudication of bankruptcy is affirmed.